WIRT ADAMS, STATE REVENUE AGENT, v. DELTA & PINE LAND COMPANY.

[42 South. Rep., 170.]

TAXATION. *Corporations. Solvent credits. Dividends.*

A corporation cannot escape taxation on its solvent credits by transferring them to its stockholders, retaining the beneficial ownership, although the assignment secured a promise of future dividends.

FROM the circuit court of, first district, Hinds county.

HON. DAVID M. MILLER, Judge.

Adams, state revenue agent, the appellant, was plaintiff in the court below; the Delta & Pine Land Company, appellee, was defendant there. From a judgment in plaintiff's favor for less than demanded, he appealed to the supreme court.

The appellee, a domestic corporation, domiciled in Jackson, Hinds county, was in 1904 assessed by the tax collector of

Hinds county, on notice given him so to do by the state revenue agent, for *ad valorem* taxes for the years 1886 to 1904, inclusive, on solvent creditors, secured by mortgages, which, it was charged, escaped taxation during said years. The appellee filed objection before the board of supervisors to the assessment, on the ground that it included mortgage notes which did not belong to appellee, but which had been distributed as dividends to the stockholders of the company. Appellee admitted liability on notes while held by it, but not after their respective transfers to its stockholders, claiming that after the transfers it had no property interest in them. The board of supervisors heard proof touching transfers of the notes to the stockholders, which showed that, from time to time, beginning with the year 1901, the appellee had declared dividends to its stockholders partly in cash and partly in mortgage notes owned by it, which notes were assigned to the stockholders as individuals, but it also showed that the appellee agreed to assume the trouble and expense of collecting the notes. The board of supervisors adjudged that the appellee company had not parted with title to the notes, and was liable for the taxes thereon, and ratified the assessment. From the judgment of the board the appellee appealed to the circuit court. The case was tried in the circuit court by the judge, a jury being waived. The revenue agent's contention was that the facts showed the distribution of the mortgage notes to the stockholders as dividends to have been made with the understanding that the notes should be guaranteed by the company and all expenses of collection should be paid by it, and that the stockholders should continue to hold the notes until payment or foreclosure, and that the whole transaction was a scheme to evade taxation, and, therefore, it failed to divest the company of title, or to relieve the company from liability for taxation. The circuit court held that the appellee was liable for taxes on the notes

only to the dates of their respective distributions, and judgment was rendered accordingly.

*Harper & Potter,* for appellant.

The transfer of notes by the board of directors was void for want of consideration, and did not pass title to the notes. In accepting the notes the stockholders did not release the corporation from liability therefor. Stockholders in receiving dividends should take the same free of any further claim thereon on the part of the corporation, and the corporation should pay the dividends without further liability upon it as regards the same.

In this case the Delta & Pine Land Company received no benefit or acquittance from its stockholders, and instead of having its affairs cleared up, its liability continued, its business became more complicated, and its estate might have been swept out of existence if these dividends were valid and if the securities had proved worthless. Suppose none of these alleged dividend notes had been paid by the makers, and under its agreement with the stockholders the company had foreclosed the mortgages and bought in all of the mortgaged lands, could the stockholders have maintained an action against the company and compelled payment, regardless of the ability of the corporation to pay without encroachment on its capital? In such case would not the company have the right to plead successfully that the alleged dividends were not declared on earned profit, and that there was no consideration for the transfer of the notes? "A bank cannot be legally taxed for railroad stock pledged to it as collateral security for a loan." *Bank* v. *Waltham,* 51 Mass., 334; *Rutherman* v. *Ingalls,* 48 Ohio St., 468.

If only the notes allotted to one stockholder had been solvent and had been collected, and the other notes had been surrendered under the agreement, and the mortgage foreclosed and

the land bought in by the appellee, there being no profits out of which appellee could pay the others, it would in such case have an action for conversion against the stockholder who had collected the notes allotted to him, because the stockholder would not have an unconditional title to the note or money, and because his title would not accrue until all the stockholders had shared alike.

The alleged dividend notes were a part of the capital of the corporation, and the board of directors had no authority to make distribution. "A dividend can lawfully be made only out of net profits. The payment of the dividend must leave the capital stock of the company intact and unimpaired, or the dividend itself will be held fraudulent and void." Cook on Corporations, 596. Boards of directors cannot increase or reduce the capital stock of the corporation." Beach on Corporations, section 192. "The authority of directors is limited to the general conduct of the business of the corporation. Such authority does not extend to an increase or reduction of capital stock." 21 Am. & Eng. Ency. Law, 863. "The agreement to pay dividends on the capital stock, without reference to the ability to pay from the earnings of the company, is opposed to public policy and void." 5 Am. & Eng. Ency. Law (1st ed.), 729.

The act of the directors in making the dividend was conceded to be void in the court below, but it was there contended by appellee that the acceptance of the notes by the stockholders was a ratification of the void act, binding the company, and the court so held. We do not think that the doctrine of ratification would apply in such case. It has no application to parties acting with knowledge of a void act and who part with nothing in so acting. Mere estoppel on the part of the stockholders would not change the legal title, as regards the appellant. The stockholders were not purchasers in good faith, and hence held

the notes as trustees for the corporation. The corporation was accordingly subject to taxation on the notes.

If the order of the directors had been valid, the transfer of the notes to the stockholders was conditional, amounting only to a pledge for a dividend to be paid at some future day.

If this had been a valid declaration of a dividend, it did not take effect, and was not to be paid; and the company could not have been required to pay the dividend until the maturity of the notes. They were held conditional by the stockholders until maturity, and until all of the notes were paid, hence the company was chargeable with the taxes. *Grenada Bank* v. *Adams, Revenue Agent,* 87 Miss., 669 (s.c., 40 South. Rep., 4).

*Frank Johnston,* for appellee.

It is important, in considering the issues involved in this case, to keep in mind that the appellee is a land company. In 1886, Thomas Watson, for himself and associates, purchased about 450,000 acres of land in the Yazoo-Mississippi delta at a sale under a decree rendered at Oxford by the United States circuit court in an equity case in which Watson was complainant and Evers, *et al.,* were defendants. This decree was for $145,000 against the defendants in the suit, and was a charge on these lands. Watson purchased at the sale to save the lands and to protect himself and his associates. Subsequently, for convenience in selling the lands, Watson and his associates incorporated under the name of Delta & Pine Land Company, and Watson, the holder of the lands, which had been purchased by him in trust for himself and associates, conveyed the same to the corporation. The lands, which nominally constituted the capital stock, were appraised at a value of $666,000. Certificates of stock were then issued to the stockholders on this basis in proportion to their interests in the land. While the charter authorizes the corporation to manufacture lumber and to do other things connected with the lands, the main busi-

ness of the company was to sell the lands. It bought no other lands except in a very few instances, where hostile titles to small parcels of land were bought in by the corporation to protect its vendees. Whenever there was a large sale of land it was the practice of the company to divide the cash payments of the purchase money, and also the notes given by the vendees for deferred payments, among the six or eight stockholders who alone composed the corporation. In some instances the company sold and transferred the notes and divided the proceeds among the stockholders. All of the notes given by the vendees of land to the company were made payable to the company or to its order, and were secured by mortgages on the lands so sold.

Whenever the company sold or discounted the mortgage notes, or distributed the same among the stockholders, the notes were always endorsed by the company. If any note was not paid at maturity the company, if requested by the holder, received back the same and collected it for the stockholder by foreclosure. Very few of the notes transferred by the company were subsequently taken back. The transfers of notes by the company to the stockholders were made in good faith, in the usual course of business in selling lands and dividing the purchase money and notes among the stockholders. The notes were transferred by the general endorsement of the company to the stockholders, and many of these notes, thus endorsed and transferred, were subsequently sold or discounted by the stockholders. These transfers were all actual, *bona fide* and unconditional transfers of the notes, passing the title of the same to the endorsees, the company continuing liable as an endorser. The assignees were also liable as endorsers of the notes in all instances where they sold and transferred the notes and placed their endorsements thereon.

From the foregoing it will be seen that the company had no other property save these lands, and was engaged in no busi-

ness save selling the same. It made no profits, within the meaning of that term. The transfers of the notes to the stockholders are called dividends, but they were not dividends at all, according to their effect on the facts in this case. The lands, wild and uncultivated, constituted what may be termed in a technical sense the capital stock of the company. The owners of the lands were tenants in common before the incorporation. After the charter was granted they continued to be the owners of the lands as stockholders, and their certificates of stock merely represented their respective interests in the lands. It is thus apparent that the charter of incorporation was adopted simply as a convenient method of selling off the lands and dividing the proceeds of the sale. When any land was sold and the notes for purchase price were taken by the corporation and subsequently distributed among the stockholders, the legal title of the notes at once passed to them by the transfer and endorsement of the company. Of course, when the legal title to the notes thus ceased to be in the company, the company ceased to be subject to taxation as regarded them. It follows just as clearly that the stockholders, when they received the notes, became liable to pay the taxes which might be assessed on them.

It is argued by learned counsel for the appellant that because of the liability of the company as an endorser of these notes, the company can be taxed on the notes after the transfer of the same to the stockholders. I cannot possibly see that this position has any bearing on the subject, which relates exclusively to the question of actual ownership. All endorsers of notes are liable as such, when they sell and transfer the notes by their endorsements. They do not continue to be owners, although liable on their endorsements. A person must be taxed on his assets and not on his liabilities. One's debts are not his property, and cannot be taxed. This was held by the supreme court of the United States. *Murray* v. *Charleston,* 96 U. S., 432; *State Tax on Foreign Held Bonds,* 15 Wall (U. S.), 300.

It is further contended by opposing counsel that there was no consideration for the transfer of these notes. None was necessary. The notes belonged in the aggregate to the stockholders, and by the division of the notes among them, each stockholder was simply getting his share of the property. The question, however, is not one of consideration. If the transfers had been made to a stranger, without consideration, the title would have passed from the company to the assignee, so far as the question of taxation is concerned. If the act in such case had been without authority in the company, nobody but the stockholders could complain.

These notes, on familiar principles of law, are taxable against the stockholders at their respective domiciles. Most of these stockholders live out of the state.

Opposing counsel contend that the directors of a corporation have no authority to divide the capital stock by way of dividends. This is true as a general proposition of law, but it cannot have application to this case, for two reasons; first, the sole purpose of incorporation was for selling off the lands and dividing the proceeds among the stockholders, and the stockholders never authorized the company to do any other business; secondly, all of the stockholders received and accepted the notes, and none of them would be permitted to question the legality of their own action, taken without objection on the part of any of them.

The cases cited by opposing counsel are not in point. The case of *Grenada Bank* v. *Adams, Revenue Agent,* 87 Miss., 669 (s.c., 40 South. Rep., 4), the only Mississippi case cited by counsel, merely involved the question of a fictitious dividend of a surplus of the bank, which surplus really never left the possession or control of the bank. The court correctly held that the bank was taxable on this money thus remaining in the vaults of the bank as a surplus.

WHITFIELD, C. J., delivered the opinion of the court.

We have given this case the most patient and careful examination, and we have reached the conclusion that on the case made by this record the judgment of the court below cannot be upheld. What was done by the directors amounted in effect to nothing else than a promise for a future dividend. The notes, as dealt with on the facts in this record, constitute merely pledges on the part of the corporation that dividends of the amount therein named would be paid at maturity. The schedules exhibited are called "dividend schedules" throughout the entire examination of the witnesses. As such they are manifestly void, for the reason that they are not set apart from the profits; but they actually represent the corpus of the property of the corporation. It is too well settled to require the citation of authority that dividends must be set apart out of the profits earned. Indeed, learned counsel for appellee does not here deny this doctrine; but he insists that what was done was, not the awarding of dividends, but a distribution *in solido* of the property of the corporation in the form of notes. There are two answers to this contention. The first is that the entire record shows beyond controversy that these notes were intended to be, and were, dealt with as dividend notes; second, the action of the directors shows clearly that the corporation practically retained the title to these notes and the control over them. That action is as follows: "Chicago, Ill., April 4th, 1901. The directors of the Delta & Pine Land Company held a meeting in Chicago, Ill., at 209-212 Clark street, and it was agreed to make a dividend of notes and cash, ten per cent., viz., nine per cent account of notes and one per cent cash. It was agreed that the notes should be guaranteed by the company and all expenses of collection paid by it. The notes to be held by the party getting them until paid or until foreclosed. The party holding the notes to bid in the land, if he so desires, when sold, or receive the cash from the company in full, with interest.

William Watson, secretary." It will thus be seen that the corporation was to bear the expense of collection and that the corporation was to do the foreclosing. If these notes had been intended to be absolutely parted with, so that the endorsees of the notes could deal with them absolutely at their own pleasure, without reference to any limitation or restriction as above set out, it was very easy so to have endorsed them. But it is perfectly obvious, from this order and from the nature of the transaction at large, that the whole purpose and scope of the endorsement of the notes was simply to pledge the amount therein contained as the measure of future dividends to be paid at maturity or until foreclosed; the foreclosure proceedings to be conducted, not by the owners, but by the corporation, and at the expense of the corporation. Many considerations show that no title can pass, in any just legal sense, under this sort of arrangement and this sort of guaranty by the corporation of the notes.

It is not insisted that any actual fraud is shown by the testimony to have been intended; but it is impossible to escape the necessary conclusion that what was done amounted to a fraud upon the public revenues. If a corporation, owning notes for land in this state which it has sold, can escape the payment of taxes on such land notes, taxes which would, if so paid, go into the treasury of this state, which affords to that corporation the protection of the law, by the easy paper process of dividing that value up amongst the stockholders, in the shape of notes whose amounts shall measure the interests of each, and thus make these notes payable at the domicile of the respective holders, it would not be long until corporations of every kind would follow suit, and there would be no estimating the damage to the tax revenues of this state. The arrangement contemplated as shown by the facts of this case, manifestly had no other purpose than to escape the payment of taxes to this state on these notes for land situated in this state, protected by the

laws of this state, by the simple paper scheme of appraising the value of the land as sold by notes, and assigning these notes to the non-resident stockholders. To sanction an arrangement like this would be a death blow to the collection of a very large part of the taxes due the state from corporations which seek and receive the protection accorded by the laws of this state. Under the facts in this record, the title to these notes did not pass to these endorsees, they did not own the notes absolutely, and they held them practically as mere pledges for the payment of future dividends.

*Wherefore the judgment is reversed, and the cause remanded.*